120 P.3d 442 (2005)
138 N.M. 360
2005-NMSC-030
UNIVERSITY OF NEW MEXICO POLICE OFFICER'S ASSOCIATION, Plaintiff-Respondent,
v.
The UNIVERSITY OF NEW MEXICO and The University of New Mexico Police Department, Defendants-Petitioners.
No. 28,559.
Supreme Court of New Mexico.
August 16, 2005.
*443 Charles N. Estes, Jr., Rodey, Dickason, Sloan, Akin & Robb, P.A., Edward Ricco, Albuquerque, for Petitioners.
Sanchez, Mowrer & Desiderio, P.C., Frederick M. Mowrer, Albuquerque, for Respondent.

OPINION
BOSSON, Chief Justice.
{1} We decide whether NMSA 1978, Section 37-1-23(A) (1976), granting governmental immunity from contract actions not based upon a "valid written contract," allows an ambiguous term of a written collective bargaining agreement, in this instance wages, to be defined by oral representations extrinsic to the contract. The district court and the Court of Appeals, the latter with each panel member writing separately, concluded that the contract was enforceable notwithstanding statutory governmental immunity. Under the facts of this case we agree, and hold that the governmental employer is not immune from the present lawsuit.

BACKGROUND
{2} In 1996, the University of New Mexico (University) and the University of New Mexico Police Officer's Association (Association), representing the campus police officers, entered into negotiations over their first collective bargaining agreement. The parties reached a point where they could not agree on wages for campus police officers. At the time of the impasse, the University was conducting a study, ultimately called UNMPact, to aid in restructuring the University's job classification and compensation system, so as to place the University's wages on a parity with comparable markets.
{3} On October 26, 1996, Susan Carkeek, Associate Vice President of the University and Director of the Human Resources Department, gave a presentation concerning the UNMPact study, which had not yet been completed, to officials of the Association. According to witnesses, Carkeek told the Association that the University would base its minimum wage rate for campus police officers on a blend of the average starting wages of the Albuquerque Police Department and the Bernalillo County Sheriff's Department *444 as indicated by the UNMPact study. During the meeting, Association members asked whether the comparable wage study would include wages paid by smaller police departments, presumably paying less than Albuquerque and Bernalillo County. In direct response, Carkeek assured the Association members that the marketplace used for the analysis would be confined to those two, higher-paying entities.
{4} The Association presented to its membership the proposed collective bargaining agreement, as supplemented by Carkeek's oral representations regarding the anticipated UNMPact study and comparable wages. Relying on these representations regarding wages, the members voted to accept the contract. The final collective bargaining agreement made written reference to the yet-unfinished UNMPact study, stating that "[t]he parties agree to participate in and fully implement the UNMPact classification and compensation study." After the parties executed the collective bargaining agreement and after the UNMPact study was completed, the University sent letters to Association members detailing their new wages. Contrary to prior representations, however, those wages were not based solely upon comparable wages for the Albuquerque Police Department and the Bernalillo County Sheriff's Department, but included a broader base of comparison. As a result, the new wages were around two dollars per hour lower than what had previously been discussed.
{5} The Association filed a lawsuit against the University for breach of the collective bargaining agreement, asking for the difference between what they were promised and what they were being paid. During a bench trial, the University presented evidence regarding the terms of the UNMPact study. In that testimony, the University denied making any representations to the Association membership regarding its proposed wages, and particularly that its wages would be in parity with the two Albuquerque-based law enforcement agencies.
{6} The University lost this evidentiary debate. The district court made a finding that Carkeek had in fact made representations to Association members limiting the comparable marketplace to the Albuquerque Police Department and the Bernalillo County Sheriff's Department. New employees were to receive the average wage of those two departments, and current employees were to receive raises in subsequent years to bring their wages near parity with those same departments. The district court further found that the Association had ratified the collective bargaining agreement in reliance upon those same representations. To the district court, failure to comply with those representations constituted adequate legal grounds for the Association to prove a breach of contract.
{7} On appeal, the University did not dispute these factual findings below. Instead, the University took the position that Section 37-1-23(A), providing for governmental immunity from civil lawsuits not based upon a valid written contract, precluded enforcement of those same oral representations. In three separate opinions, the Court of Appeals affirmed the district court, although it struggled to develop a consensus as to the rationale. See UNM Police Officer's Ass'n v. UNM, 2004-NMCA-050, 135 N.M. 655, 92 P.3d 667. We granted certiorari to address whether statutorily created sovereign immunity applies in this case.

DISCUSSION
{8} Section 37-1-23(A) states, "[g]overnmental entities are granted immunity from actions based on contract, except actions based on a valid written contract." In analyzing the application of the statute to the facts of this case, we are faced with a question of law, subject to de novo review. Campos de Suenos, Ltd. v. County of Bernalillo, 2001-NMCA-043, ¶ 10, 130 N.M. 563, 28 P.3d 1104. Section 37-1-23(A) was created in response to this Court's opinion abolishing common-law sovereign immunity. See Hicks v. State, 88 N.M. 588, 544 P.2d 1153 (1975), superseded by statute as stated in, Electro-Jet Tool Mfg. Co. v. City of Albuquerque, 114 N.M. 676, 845 P.2d 770 (1992); see also Hydro Conduit Corp. v. Kemble, 110 N.M. 173, 177-79, 793 P.2d 855, 859-61 (1990) (outlining the legislative history of the statute).
*445 {9} On certiorari, the University does not argue the evidence was insufficient to support the trial court's findings about either Carkeek's representations or the Association's reliance. During oral argument, the University further conceded that the parties had agreed upon and executed a written collective bargaining agreement which had been fully implemented over the years. Because that written agreement omitted any explicit determination of wages, however, the University argues that we cannot allow the courts to define a major term of the contract by resort to extrinsic oral representations.
{10} It is unclear whether the University argues that the entire contract is invalid in its formation because wages were not adequately defined in writing, or whether the immunity statute bars just the interpretation of the wage term through oral representations. Part of the reason this is unclear is because this case does not fall cleanly into either contract interpretation or formation. "Analytically, this case falls in the gap between cases such as Campos de Suenos and Trujillo v. Gonzales, 106 N.M. 620, 747 P.2d 915 (1987), on the one hand[,] and Garcia v. Middle Rio Grande Conservancy Dist., [1996-NMSC-029,] 121 N.M. 728, 918 P.2d 7 (1996), and Handmaker [v. Henney, 1999-NMSC-043, 128 N.M. 328, 992 P.2d 879] on the other." UNM Police Officer's Ass'n, 2004-NMCA-050, ¶ 31, 135 N.M. 655, 92 P.3d 667 (Bustamante, J., specially concurring). "Broadly speaking, Trujillo and Campos de Suenos address issues surrounding the creation of new contractual relationships whereas Garcia and Handmaker involve disagreements about the details of an existing employment relationship evidenced by a writing." Id. ¶ 37 (Bustamante, J., specially concurring).
{11} On the surface, it is difficult to take seriously any argument that NMSA 1978, Section 37-1-23(A) (1976) renders the entire collective bargaining agreement invalid, or makes the University immune from a lawsuit for a breach of that agreement. The collective bargaining agreement is a lengthy, twenty-eight page document detailing many areas of the employment relationship. Clearly, the collective bargaining agreement constitutes a "valid written contract" within the meaning of Section 37-1-23(A). Although the contract did not specify a wage term, it made written reference to the "UNMPact classification and study," a written document about comparable wages, which the parties contractually agreed in writing to "participate in and fully implement." Furthermore, the University did implement the collective bargaining agreement and enjoyed its benefits for all the years it was in force.
{12} Conceding the improbability of any successful challenge to the contract's existence, the University nonetheless draws an analogy between Section 37-1-23(A) and the common-law statute of frauds. The University argues broadly that if all essential terms are not in writing, then like the statute of frauds, Section 37-1-23(A) renders any government contract unenforceable in a court of law.
{13} We acknowledge the general principle, applicable to certain contracts to which the statute of frauds applies, that major terms must be supplied in writing without resort to parol evidence. See, e.g., Rhodes v. Wilkins, 83 N.M. 782, 783, 498 P.2d 311, 312 (1972) (discussing under statute of frauds that "the writing identify with reasonable certainty the property to which the contract relates" without resort to parol evidence). See generally 10 Samuel Williston, A Treatise on the Law of Contracts § 29.8, at 473, 480 (Richard A. Lord, ed., 4th ed.1999) (indicating memorandum that does not contain all essential terms "cannot be eked out by parol evidence;" particulars required by statute of frauds may be provided by reference to other writings or determinable facts "as distinguished from conversations") (footnotes omitted).
{14} In effect, the University takes this general proposition, infuses it into Section 37-1-23(A), and concludes that the Legislature must have had the statute of frauds in mind when it required a "valid written contract," even for those contracts to which the common-law statute of frauds would not otherwise apply. Cf. Kestenbaum v. Pennzoil Co., 108 N.M. 20, 23-24, 766 P.2d 280, 283-84 (1988) (stating that an at-will employment contract did not fall within the statute of *446 frauds because it could be performed in under one year). In other words, the University would have us construe Section 37-1-23(A) as if it granted governmental immunity "except actions based on a valid written contract" enforceable under the statute of frauds.
{15} In its response, the Association rejects the argument that Section 37-1-23(A) is akin to the common-law statute of frauds. The Association emphasizes that Section 37-1-23(A), on its face, requires only that a valid written contract be proven, without any express limitation on the manner of proof. Once proven, the Association continues, a written contract need not have every term in writing, leaving the parties free to turn to traditional methods of resolving contractual ambiguities, like parol evidence, that obtain in the private sector. See Mark V, Inc. v. Mellekas, 114 N.M. 778, 781-82, 845 P.2d 1232, 1235-36 (1993); C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 508, 817 P.2d 238, 242 (1991).
{16} We think both parties may have overstated their case. With respect to the University's position, our courts have never drawn a clear-cut parallel between Section 37-1-23(A) and the common-law statute of frauds. We divine no legislative intent that we do so. In some instances, the immunity statute may produce a more stringent restriction than the common-law statute of frauds. See Campos de Suenos, 2001-NMCA-043, ¶¶ 18-19 (holding that the immunity statute did not allow the parties to "cobble together" a series of writings to fashion a "valid written contract," even though those writings might suffice under the common-law statute of frauds). In other instances, like the matter before us, the immunity statute may be satisfied by something less than what the statute of frauds might require. Our courts have previously described the analytical distinctions between the statute of frauds and an immunity statute, and we see no reason to belabor the point here. See id. ¶¶ 13-17.
{17} We also have reservations, however, about the Association's point of view, at least with respect to the full reach of its position. We share the same concerns expressed below by Chief Judge Bustamante and Judge Sutin of the Court of Appeals that we not open the doors to parol evidence in all circumstances, for all ambiguities, in any kind of government contract, to the same degree as contracts between private parties. UNM Police Officer's Ass'n, 2004-NMCA-050, ¶¶ 26, 57. We do not do so in this opinion. There may come a time, for example, when resort to parol evidence to clarify an ambiguity so changes the import of the written document under less-than-reliable circumstances, that we would risk undercutting the vital public policy concerns that animate Section 37-1-23(A). We need not anticipate the parameters of those concerns in this opinion.
{18} Instead, we trace a more moderate, middle path. Our holding is confined to the compelling circumstances of this case that narrow its scope accordingly. Here, we have what no one seriously questions is a "valid written contract." That threshold finding is pivotal because without it the University is clearly immune from a lawsuit. Campos de Suenos, 2001-NMCA-043, ¶ 13. Furthermore, this is an employment contract which was executed, implemented, and relied upon for years by both parties. In the field of government employment contracts, our courts have been particularly sensitive to an employee's reliance upon extrinsic evidence to aid in interpreting an existing employment relationship evidenced by a writing. See Garcia., 1996-NMSC-029, ¶ 20; Handmaker, 1999-NMSC-043, ¶ 19 n. 2. In the past, that extrinsic evidence has usually been in the form of other writings, such as a personnel manual or written memoranda regarding a written contract. Garcia, 1996-NMSC-029, ¶ 20; Handmaker, 1999-NMSC-043 ¶ 19. But we have never prohibited reliance upon oral representations to interpret an ambiguity in a valid written contract. Cf. Trujillo, 106 N.M. at 622, 747 P.2d at 917 (holding that county was immune from lawsuit based on oral representation that contradicted terms of employment contract); Handmaker, 1999-NMSC-043, ¶ 19 n. 2.
{19} Importantly, the written words of this particular employment agreement were left intentionally vague, expressly anticipating the UNMPact classification and compensation *447 study which had not yet been completed. This is not a case of reliance upon verbal representations alone not rooted in the written document. Under these special circumstances and perhaps implicit in the written reference to the uncompleted study, it is not unexpected that the parties would anticipate collateral discussions between the parties explaining what that study would likely mean. Any contrary inference defies both logic and common experience: that a labor union engaged in collective bargaining would leave a central term like wages to the sole discretion of its employer. UNM Police Officer's Ass'n, 2004-NMCA-050, ¶ 55 (Sutin, J. specially concurring).
{20} Not surprisingly, the parties proceeded to act in a manner consistent with what reasonably could be anticipated from the contract. A University official, cloaked with apparent authority, made clear-cut representations to the Association about both the process and the formula to be used in arriving at compensation. The trial court found those representations compelling and the ensuing reliance reasonable. Those representations did not contradict or try to reform anything said in the written contract. Cf. Trujillo, 106 N.M. at 621, 747 P.2d at 916; Handmaker, 1999-NMSC-043, ¶ 19 n. 2. Under these circumstances, therefore, we conclude that both the district court and the Court of Appeals were correct in looking to oral representations to clarify the existing written contract.
{21} As a final note of caution, we are especially aware of the important public policy issues that animate Section 37-1-23(A), and we are persuaded that our holding does not undercut those polices in this instance. Section 37-1-23(A) is designed as a prophylactic measure to protect the public treasury. Campos de Suenos, 2001-NMCA-043, ¶ 14. To protect the taxpayer, the statute puts the risk of loss on those seeking promises from government; it requires at a minimum that they obtain a valid written contract in order to maintain a lawsuit to enforce those promises. Hydro Conduit Corp., 110 N.M. at 180, 793 P.2d at 862.
{22} Those concerns are largely assuaged in this instance. We note the public nature of the subject matter: a collective bargaining agreement between labor and management, negotiated over time and subject to public scrutiny, involving our largest public educational institution. Under the light of public scrutiny, the risk of fraud and corruption, though an ever-present concern, should be reduced to a minimum. UNM Police Officer's Ass'n, 2004-NMCA-050, ¶ 54 (Sutin, J. specially concurring). With those assurances, both the University and the taxpayer have less need for the extreme safeguard of absolute immunity, with all the inequity that immunity sometimes entails. We are confident that our rejection of governmental immunity under the circumstances of this case is consistent with the legislative intent that gave rise to Section 37-1-23(A).

CONCLUSION
{23} We affirm the Court of Appeal's holding that Section 37-1-23(A) is not a bar to enforcement of the collective bargaining agreement including the portions proven by oral representations.
{24} IT IS SO ORDERED.
SERNA, MAES and CHAVEZ, JJ., and CASTILLO, J. (sitting by designation), concur.
CASTILLO, Judge (sitting by designation).